**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| CURTIS MCCULLOUGH, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STRATEGIC EDUCATION, INC.,<br><br>Defendant. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Curtis Mccullough ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Strategic Education, Inc. ("Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

## I. NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Defendant is a private education company that owns and operates several schools and education platforms including Strayer University and Capella University.[1]

3. As such, Defendant stores a litany of highly sensitive personal identifiable information ("PII" or "Private Information") about its current and former students. But Defendant

[1] *Our Offerings*, STRATEGIC EDUCATION INC., https://sei.strategiceducation.com/about/company-info/our-offerings/default.aspx (last visited June 4, 2026).

lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4. On or around May 29, 2026, Defendant began notifying state government officials about the Data Breach and sending breach notices to the victims affected. A sample of the breach notices are attached as Exhibit A.

5. It is unknown for precisely how long the cybercriminals had access to Defendant's network before the breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former students' Private Information.

6. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's Private Information. In short, Defendant's failures placed the Class's Private Information in a vulnerable position—rendering them easy targets for cybercriminals.

7. Plaintiff is a Data Breach victim, and he brings this class action on behalf of himself, and all others harmed by Defendant's misconduct.

8. The exposure of one's Private Information to cybercriminals is a bell that cannot be unrung. Before this data breach, its current and former students' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## II. PARTIES

9. Plaintiff is a natural person and a citizen of Charlotte, North Carolina where he intends to remain.

10. Defendant is a corporation, incorporated in Virginia and with its principal place of business at 2303 Dulles Station Blvd, Herndon, Virginia.

## III. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiff and Defendant are citizens of different states. And there are over 100 putative Class Members.

12. This Court has personal jurisdiction over Defendant because it is headquartered in Virginia, regularly conducts business and has sufficient minimum contacts in Virginia.

13. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## IV. BACKGROUND

### *A. Defendant Collected and Stored the Private Information of Plaintiff and the Class*

14. Defendant is a private education company that owns and operates several schools and education platforms including Strayer University and Capella University.[2]

15. Defendant is publicly traded on Nasdaq with a total annual revenue of $1.2 billion and a total enrollment of 108,685 students.[3]

16. As part of its business, Defendant receives and maintains the Private Information of thousands of its current and former students.

---

[2] *Our Offerings*, STRATEGIC EDUCATION INC., https://sei.strategiceducation.com/about/company-info/our-offerings/default.aspx (last visited June 4, 2026).

[3] *Company Profile*, STRATEGIC EDUCATION INC., https://s203.q4cdn.com/245423802/files/doc_downloads/2025/04/SEI-Company-Profile-2025.pdf (last visited June 4, 2026).

17. In collecting and maintaining the Private Information, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their Private Information.

18. Under state and federal law, businesses like Defendant have duties to protect its current and former students' Private Information and to notify them about breaches.

19. Defendant recognizes these duties, declaring in its "Privacy Policy" that:

a. "If you are a student (or are applying to become a student) at an educational institution that is wholly owned by [Defendant]…your education records are protected under the Family Educational Rights and Privacy Act ("FERPA")."[4]

b. "We maintain reasonable administrative, physical and technological measures to protect the confidentiality and security of Personal Information you submit on or through our Services."[5]

c. "Where applicable under local law, you may have certain rights with respect to your Personal Information."[6]

***B. Defendant's Data Breach***

20. Between February 23, 2026, and February 25, 2026, Defendant was hacked in the Data Breach.[7]

---

[4] *Privacy Policy*, STRATEGIC EDUCATION INC., https://www.strategiceducation.com/privacy/ (last visited June 4, 2026).
[5] *Id*.
[6] *Id*.
[7] *See* Exhibit A.

21. Worryingly, Defendant already admitted that "an unauthorized actor accessed our computer servers…and took copies of certain files."[8]

22. Because of Defendant's Data Breach, at least the following types of Private Information were compromised:

a. Name;

b. Social Security number;

c. Driver's license number; and

d. Passport number.

23. Upon information and belief, Defendant injured at least 1,500,000 persons—via the exposure of their Private Information—in the Data Breach. Upon information and belief, these 1,500,000 persons include its current and former students.

24. And yet, Defendant waited until May 29, 2026, before it began notifying the class—a full 95 days after the Data Breach began.[9]

25. Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

26. And when Defendant did notify Plaintiff and the Class of the Data Breach, Defendant acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiff and the Class:

a. "We encourage you to remain vigilant by regularly reviewing your credit report for unauthorized activity."[10]

[8] *Id.*
[9] *Id.*
[10] *Id.*

b. "If you see activity you did not authorize, please contact the relevant credit bureau immediately."[11]

c. "If you believe you are the victim of identity theft or have reason to believe your personal information has been misused, you should immediately contact the Federal Trade Commission and/or the Attorney General's office in your state."[12]

27. Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the Private Information. And thus, Defendant caused widespread injury and monetary damages.

28. Since the breach, Defendant claims that "[t]o help prevent a similar incident from happening again, [Defendant] is taking steps to enhance its existing security measures."[13]

29. But such simple declarations are insufficient to ensure that Plaintiff's and Class Members' Private Information will be protected from additional exposure in a subsequent data breach.

30. Defendant has done little to remedy its Data Breach. True, Defendant has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiff and Class Members for the injuries that Defendant inflicted upon them.

[11] *Id.*
[12] *Id.*
[13] *Id.*

31. Because of Defendant's Data Breach, the sensitive Private Information of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

***C. Plaintiff's Experiences and Injuries***

32. Upon information and belief, Plaintiff is a former student of Defendant's school.

33. Thus, Defendant obtained and maintained Plaintiff's Private Information.

34. As a result, Plaintiff was injured by Defendant's Data Breach.

35. Plaintiff is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

36. As a condition of enrolling at Defendant's university, Plaintiff provided Defendant with his Private Information.

37. Plaintiff provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

38. Plaintiff reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of Private Information.

39. And on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

40. Through its Data Breach, Defendant compromised Plaintiff's Private Information.

41. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

42. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails, text messages and phone calls.

43. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

44. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

45. Plaintiff suffered actual injury from the exposure and theft of his Private Information —which violates his rights to privacy.

46. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

47. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's Private Information right in the hands of criminals.

48. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

49. Today, Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

### *D. Consumers Prioritize Data Security*

50. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[14] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[15]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[16]

c. 89% of consumers stated that "I care about data privacy."[17]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[18]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[19]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[20]

---

[14] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited June 4, 2026).
[15] *Id*. at 3.
[16] *Id*.
[17] *Id*. at 9.
[18] *Id*.
[19] *Id*.
[20] *Id*. at 11.

### *E. Plaintiff and the Proposed Class Suffered Common Injuries and Damages*

51. Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their Private Information is used;

b. diminution in value of their Private Information;

c. compromise and continuing publication of their Private Information;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen Private Information; and

h. continued risk to their Private Information—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the Private Information.

### *F. Substantially Increased Risk of Identity Theft and Fraud*

52. Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

53. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

54. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

55. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the Dark Web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

56. The "Dark Web" is an unindexed layer of the internet that requires special software or authentication to access.[21] Criminals in particular favor the Dark Web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, Dark Web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the Dark Web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[22] This prevents Dark Web marketplaces from being easily monitored by authorities or accessed by those not in the know.

57. The unencrypted Private Information of Plaintiff and Class Members has or will end up for sale on the Dark Web because that is the modus operandi of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it

---

[21] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited June 4, 2026).
[22] *Id*.

for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Plaintiff's and Class Members' Private Information.

58. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

59. In particular, the theft of Social Security numbers—in combination with other Private Information (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

60. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[23] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[24]

61. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected

---

[23] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[24] *Id*.

fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

62. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[25]

63. It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their Private Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

64. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

65. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

---

[25] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

66. Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[26]

67. One example of criminals piecing together bits and pieces of compromised Private Information to create comprehensive dossiers on individuals is called "Fullz" packages.[27] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen Private

---

[26] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited June 4, 2026).

[27] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

Information, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

68. The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

69. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[28]

70. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiff and the Class that their Private Information was stolen. Defendant's failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

---

[28] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited June 4, 2026).

71. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

72. In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

73. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

***G. Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

74. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

75. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[29]

76. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have

---

[29] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

lesser IT defenses and a high incentive to regain access to their data quickly."[30]

77. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***H. Defendant Could Have Prevented the Data Breach***

78. Data breaches are preventable.[31] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[32]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[33]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures…Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [34]

***I. Defendant Failed to Follow FTC Guidelines***

---

[30] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[31] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).

[32] *Id.* at 17.

[33] *Id.* at 28.

[34] *Id.*

79. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

80. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[35] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

81. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

82. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

---

[35] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

83. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

84. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former students' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***J. Defendant Failed to Follow Industry Standards***

85. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

86. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

87. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02,

PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

88. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## V. CLASS ACTION ALLEGATIONS

89. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose Private Information was compromised in Defendant's Data Breach that occurred in February 2026.

90. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

91. Plaintiff reserves the right to amend the class definition.

92. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

93. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

94. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 1,500,000 members.

95. Typicality. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

96. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

97. Commonality and Predominance. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's Private Information;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant were negligent in maintaining, protecting, and securing Private Information;

d. if Defendant breached contract promises to safeguard Plaintiff and the Class's Private Information;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant's Breach Notice was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

98. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
**Negligence**
**(On Behalf of Plaintiff and the Class)**

99. Plaintiff re-alleges and incorporates by reference all preceding allegations contained in paragraphs 1 through 98, as if fully set forth herein.

100. Plaintiff and the Class entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their Private Information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

101. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their Private Information in a data breach. And here, that foreseeable danger came to pass.

102. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if their Private Information was wrongfully disclosed.

103. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class Members' Private Information.

104. Defendant owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the Private Information in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their Private Information.

105. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

106. Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain under applicable regulations.

107. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

108. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

109. The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendant holds vast amounts of Private Information, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the Private Information —whether by malware or otherwise.

110. Private Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

111. Defendant improperly and inadequately safeguarded the Private Information of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

112. Defendant breached these duties as evidenced by the Data Breach.

113. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' Private Information by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

114. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

115. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

116. Defendant has admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

117. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

118. And, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

119. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Negligence *per se***
**(On Behalf of Plaintiff and the Class)**

120. Plaintiff re-alleges and incorporates by reference all preceding allegations contained in paragraphs 1 through 98, as if fully set forth herein.

121. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

122. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as

Defendant, of failing to use reasonable measures to protect the Private Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive Private Information.

123. Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Private Information.

124. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

125. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

126. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

127. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their Private Information.

128. Defendant's various violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

129. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

130. Plaintiff re-alleges and incorporates by reference all preceding allegations contained in paragraphs 1 through 98, as if fully set forth herein.

131. Plaintiff and Class Members either directly contracted with Defendant or Plaintiff and Class Members were the third-party beneficiaries of contracts with Defendant.

132. Plaintiff and Class Members were required to provide their Private Information to Defendant as a condition of receiving services provided by Defendant. Plaintiff and Class Members provided their Private Information to Defendant or its third-party agents in exchange for Defendant's services.

133. The contracts entered into by Plaintiff's and Class Members' agents (for example, their universities), were made for the direct benefit of Plaintiff and the Class.

134. Plaintiff and Class Members reasonably understood that a portion of the funds they paid would be used to pay for adequate cybersecurity measures.

135. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

136. Plaintiff and the Class Members accepted Defendant's offers by disclosing their Private Information to Defendant or its third-party agents in exchange for services.

137. In turn, and through internal policies, Defendant agreed to protect and not disclose the Private Information to unauthorized persons.

138. In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiff's and Class Member's Private Information.

139. Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

140. After all, Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of such an agreement with Defendant.

141. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

142. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

143. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

144. Defendant materially breached the contracts it entered with Plaintiff and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic Private Information that Defendant created, received, maintained, and transmitted.

145. In these and other ways, Defendant violated its duty of good faith and fair dealing.

146. Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

147. And, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

148. Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

## FOURTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

149. Plaintiff re-alleges and incorporates by reference all preceding allegations contained in paragraphs 1 through 98, as if fully set forth herein.

150. This claim is pleaded in the alternative to the breach of implied contract claim.

151. Plaintiff and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their Private Information to provide services, and (2) accepting payment.

152. Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

153. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

154. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

155. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

156. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and Class Members' (1) Private Information and (2) payment because Defendant failed to adequately protect their Private Information.

157. Plaintiff and Class Members have no adequate remedy at law.

158. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

## FIFTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

159. Plaintiff re-alleges and incorporates by reference all preceding allegations contained in paragraphs 1 through 98, as if fully set forth herein.

160. Given the relationship between Defendant and Plaintiff and Class Members, where Defendant became guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

161. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with them—especially to secure their Private Information.

162. Because of the highly sensitive nature of the Private Information, Plaintiff and Class Members would not have entrusted Defendant, or anyone in Defendant's position, to retain their Private Information had they known the reality of Defendant's inadequate data security practices.

163. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class Members' Private Information.

164. Defendant also breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

165. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**SIXTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

166. Plaintiff re-alleges and incorporates by reference all preceding allegations contained in paragraphs 1 through 98, as if fully set forth herein.

167. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

168. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

169. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiff and Class Members.

170. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

171. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

172. And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class Members' injuries.

173. If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

174. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

## VI. PRAYER FOR RELIEF

Plaintiff and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

## VII. DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Date: June 4, 2026

Respectfully submitted,

*<u>/s/ Ramon Rodriguez III</u>*
Ramon Rodriguez, III (Bar No. VA48721)
**SIRI & GLIMSTAD LLP**
11 South 12th Street
Richmond, VA 23219
Tel: (509) 822-2463
E: rrodriguez@sirillp.com

Tyler J. Bean *
Kennedy M. Brian *
**SIRI & GLIMSTAD LLP**
101 Park Avenue
Suite 1300 - #16982799
Oklahoma City, OK 73102
Tel: (212) 532-1091
E: tbean@sirillp.com
E: kbrian@sirillp.com

Kenneth Grunfeld*
**KOPELOWITZ OSTROW P.A.**
65 Overhill Rd
Bala Cynwyd, PA 19004
Tel: (954) 525-4100
grunfeld@kolawyers.com

**Pro hac vice forthcoming*

*Attorneys for Plaintiff and Proposed Class*

# EXHIBIT A

**Appendix**

Strategic Education Inc. ("SEI") recently concluded its investigation of an incident involving unauthorized access to its computer network. Upon discovering the incident, SEI secured its network and commenced an investigation. The investigation determined that an unauthorized actor accessed SEI's computer servers between February 23, 2026 and February 25, 2026 and took copies of certain files.

SEI reviewed the files involved and, on May 21, 2026, determined that they contained the name and one or more of the following: Social Security number, driver's license number, and passport number, for 2,673 Maine residents.

On May 29, 2026, SEI began mailing notification letters via United States Postal Service First-Class mail to the affected Maine residents. A copy of the notification is enclosed. SEI has provided the phone number of its toll-free call center for individuals to call with questions about the incident and is providing notified individuals with an offer of identity monitoring services through Kroll.

To help prevent a similar incident from happening again, SEI is taking steps to enhance its existing security measures.

STRATEGIC EDUCATION INC

<<Return to Kroll>>
<<Return Address>>
<<City, State ZIP>>

<<FIRST_NAME>> <<MIDDLE_NAME>> <<LAST_NAME>> <<SUFFIX>>
<<ADDRESS_1>>
<<ADDRESS_2>>
<<CITY>>, <<STATE_PROVINCE>> <<POSTAL_CODE>>
<<COUNTRY>>

KROLL

SCAN TO ENROLL

<<Date>> (Format: Month Day, Year)

Dear <<First_name>> <<Last_name>>:

Strategic Education Inc., the parent company of <<b2b_text_1 (Strayer University / Strayer University and Capella University / Capella University)>>, recognizes the importance of protecting the privacy and security of the information we maintain, which is why we are writing to inform you that we identified and addressed a data security incident involving some of your information. This notice explains the incident, the measures we have taken in response, and some additional steps you may consider taking.

We recently concluded our investigation of an incident involving unauthorized access to our computer network. Upon discovering the incident, we secured our network and commenced an investigation. The investigation determined that an unauthorized actor accessed our computer servers between February 23, 2026 and February 25, 2026, and took copies of certain files. We reviewed the files involved and, on May 21, 2026, we determined they contained your name and one or more of the following: Social Security number, driver's license number, and passport number.

We encourage you to remain vigilant by regularly reviewing your credit report for unauthorized activity. If you see activity you did not authorize, please contact the relevant credit bureau immediately. We have secured the services of Kroll to offer you a complimentary <<ServiceTerminMonths>>-year membership of identity monitoring services. This product is completely free to you and enrolling will not hurt your credit score. **For more information on the identity monitoring services, including instructions on how to activate your complimentary membership, as well as some additional steps you can take to protect your information, please see the pages that follow this letter**.

We regret any inconvenience that this may cause. To help prevent a similar incident from occurring in the future, we have implemented additional measures to enhance the security of our IT network. If you have any questions, please call (844) 959-7093, Monday through Friday, between 8:00 am to 5:30 pm Central Time, excluding major US holidays.

Sincerely,

Strategic Education Inc.

KROLL

## TAKE ADVANTAGE OF YOUR IDENTITY MONITORING SERVICES

Visit **https://enroll.krollmonitoring.com** to activate and take advantage of your identity monitoring services.

*You have until* ***<<b2b_text_6 (activation deadline)>>*** *to activate your identity monitoring services.*

Membership Number: **<<Membership Number s_n>>**

You have been provided with access to the following services from Kroll:

### Single Bureau Credit Monitoring

You will receive alerts when there are changes to your credit data—for instance, when a new line of credit is applied for in your name. If you do not recognize the activity, you'll have the option to call a Kroll fraud specialist, who will be able to help you determine if it is an indicator of identity theft. To receive credit services, you must be over the age of 18 and have established credit in the U.S., have a Social Security number in your name, and have a U.S. residential address associated with your credit file.

### Fraud Consultation

You have unlimited access to consultation with a Kroll fraud specialist. Support includes showing you the most effective ways to protect your identity, explaining your rights and protections under the law, assistance with fraud alerts, and interpreting how personal information is accessed and used, including investigating suspicious activity that could be tied to an identity theft event.

### Identity Theft Restoration

If you become a victim of identity theft, an experienced Kroll licensed investigator will work on your behalf to resolve related issues. You will have access to a dedicated investigator who understands your issues and can do most of the work for you. Your investigator will be able to dig deep to uncover the scope of the identity theft, and then work to resolve it.

Kroll's activation website is only compatible with the current version or one version earlier of Chrome, Firefox, Safari and Edge.

To receive credit services, you must be over the age of 18 and have established credit in the U.S., have a Social Security number in your name, and have a U.S. residential address associated with your credit file.

## ADDITIONAL STEPS YOU CAN TAKE

We remind you it is always advisable to be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity. You may obtain a copy of your credit report, free of charge, once every 12 months from each of the three nationwide credit reporting companies. To order your annual free credit report, please visit www.annualcreditreport.com or call toll free at 1-877-322-8228. Contact information for the three nationwide credit reporting companies is as follows:

- *Equifax*, PO Box 740241, Atlanta, GA 30374, www.equifax.com, 1-888-378-4329
- *Experian*, PO Box 2002, Allen, TX 75013, www.experian.com, 1-888-397-3742
- *TransUnion*, PO Box 1000, Chester, PA 19016, www.transunion.com, 1-833-799-5355

If you believe you are the victim of identity theft or have reason to believe your personal information has been misused, you should immediately contact the Federal Trade Commission and/or the Attorney General's office in your state. You can obtain information from these sources about steps an individual can take to avoid identity theft as well as information about fraud alerts and security freezes. You should also contact your local law enforcement authorities and file a police report. Obtain a copy of the police report in case you are asked to provide copies to creditors to correct your records. Contact information for the Federal Trade Commission is as follows:

- *Federal Trade Commission*, Consumer Response Center, 600 Pennsylvania Avenue NW, Washington, DC 20580, 1-877-IDTHEFT (438-4338), www.identitytheft.gov

### Fraud Alerts and Security Freezes

***Fraud Alerts:*** There are two types of general fraud alerts you can place on your credit report to put your creditors on notice that you may be a victim of fraud—an initial alert and an extended alert. You may ask that an initial fraud alert be placed on your credit report if you suspect you have been, or are about to be, a victim of identity theft. An initial fraud alert stays on your credit report for one year. You may have an extended alert placed on your credit report if you have already been a victim of identity theft with the appropriate documentary proof. An extended fraud alert stays on your credit report for seven years.

To place a fraud alert on your credit reports, contact one of the nationwide credit bureaus. A fraud alert is free. The credit bureau you contact must tell the other two, and all three will place an alert on their versions of your report.

For those in the military who want to protect their credit while deployed, an Active Duty Military Fraud Alert lasts for one year and can be renewed for the length of your deployment. The credit bureaus will also take you off their marketing lists for pre-screened credit card offers for two years, unless you ask them not to.

***Credit or Security Freezes:*** You have the right to put a credit freeze, also known as a security freeze, on your credit file, free of charge, which makes it more difficult for identity thieves to open new accounts in your name. That's because most creditors need to see your credit report before they approve a new account. If they can't see your report, they may not extend the credit.

*How do I place a freeze on my credit reports?* There is no fee to place or lift a security freeze. Unlike a fraud alert, you must separately place a security freeze on your credit file at each credit reporting company. For information and instructions to place a security freeze, contact each of the credit reporting agencies at the addresses below:

- *Equifax Security Freeze*, PO Box 105788, Atlanta, GA 30348, www.equifax.com
- *Experian Security Freeze*, PO Box 9554, Allen, TX 75013, www.experian.com
- *TransUnion Security Freeze*, PO Box 160, Woodlyn, PA 19094, www.transunion.com

You'll need to supply your name, address, date of birth, Social Security number and other personal information.

After receiving your freeze request, each credit bureau will provide you with a unique PIN (personal identification number) or password. Keep the PIN or password in a safe place. You will need it if you choose to lift the freeze.

*How do I lift a freeze?* A freeze remains in place until you ask the credit bureau to temporarily lift it or remove it altogether. If the request is made online or by phone, a credit bureau must lift a freeze within one hour. If the request is made by mail, then the bureau must lift the freeze no later than three business days after getting your request.

If you opt for a temporary lift because you are applying for credit or a job, and you can find out which credit bureau the business will contact for your file, you can save some time by lifting the freeze only at that particular credit bureau. Otherwise, you need to make the request with all three credit bureaus.

Strategic Education Inc. is located at 2303 Dulles Station Boulevard, 6th Floor, Herndon, VA 20171 and can be reached by phone at 703-561-1600.

**Additional information for residents of the following states:**

Connecticut: You may contact and obtain information from your state attorney general at: *Connecticut Attorney General's Office*, 165 Capitol Ave, Hartford, CT 06106, 1-860-808-5318, www.ct.gov/ag

District of Columbia: You may contact and obtain information from your attorney general at: Office of the Attorney General for the District of Columbia, 400 6th Street NW, Washington, DC 20001, 1-202-727-3400, www.oag.dc.gov

Maryland: You may contact and obtain information from your state attorney general at: *Maryland Attorney General's Office*, 200 St. Paul Place, Baltimore, MD 21202, 1-888-743-0023 / 1-410-576-6300, www.marylandattorneygeneral.gov/

New York: You may contact and obtain information from these state agencies: *New York Department of State Division of Consumer Protection,* One Commerce Plaza, 99 Washington Ave., Albany, NY 12231-0001, 518-474-8583 / 1-800-697-1220, |http://www.dos.ny.gov/consumerprotection; and *New York State Office of the Attorney General,* The Capitol, Albany, NY 12224-0341, 1-800-771-7755, https://ag.ny.gov

North Carolina: You may contact and obtain information from your state attorney general at: *North Carolina Attorney General's Office*, 9001 Mail Service Centre, Raleigh, NC 27699, 1-919-716-6000 / 1-877-566-7226, www.ncdoj.gov

Rhode Island: <<b2b_text_3 (This incident involves [INSERT NUMBER] individuals in Rhode Island.)>> Under Rhode Island law, you have the right to file and obtain a copy of a police report. You also have the right to request a security freeze, as described above. You may contact and obtain information from your state attorney general at: *Rhode Island Attorney General's Office*, 150 South Main Street, Providence, RI 02903, 1-401-274-4400, www.riag.ri.gov

West Virginia: You have the right to ask that nationwide consumer reporting agencies place "fraud alerts" in your file to let potential creditors and others know that you may be a victim of identity theft, as described above. You also have a right to place a security freeze on your credit report, as described above.

New Mexico: A Summary of Your Rights Under the Fair Credit Reporting Act: The federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies. There are many types of consumer reporting agencies, including credit bureaus and specialty agencies (such as agencies that sell information about check writing histories, medical records, and rental history records). Your major rights under the FCRA are summarized below. For more information, including information about additional rights, go to www.consumerfinance.gov/learnmore or write to: Consumer Financial Protection Bureau, 1700 G Street NW, Washington, DC 20552.

- You must be told if information in your file has been used against you.
- You have the right to know what is in your file.
- You have the right to ask for a credit score.
- You have the right to dispute incomplete or inaccurate information.
- Consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information.
- Consumer reporting agencies may not report outdated negative information.
- Access to your file is limited.
- You must give your consent for reports to be provided to employers.
- You may limit "prescreened" offers of credit and insurance you get based on information in your credit report.
- You have a right to place a "security freeze" on your credit report, which will prohibit a consumer reporting agency from releasing information in your credit report without your express authorization.
- You may seek damages from violators.
- Identity theft victims and active duty military personnel have additional rights.